IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

DORA BERNICE WEATHERLY,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C12-2001

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.   *Weatherly's Education and Employment Background* . . . . . . . . . . 5
      B.   *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . . . 5
           1.   *Weatherly's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . 5
           2.   *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . 8
      C.   *Weatherly's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      A.   *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . 15
      B.   *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . 16
           1.   *Evaluation of Medical Evidence and the ALJ's Hypothetical
                Question to the Vocational Expert* . . . . . . . . . . . . . . . . 17
           2.   *The ALJ's Assessment of Weatherly's Credibility* . . . . . . . 19
      C.   *Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VI.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII.  *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Dora Bernice Weatherly on January 12, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits. Weatherly asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her SSI benefits. In the alternative, Weatherly requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On August 19, 2009, Weatherly applied for SSI benefits. In her application, Weatherly alleged she has been disabled since May 1, 1997 due to pain in her back and knees. Weatherly's applications were denied on November 30, 2009. On February 24, 2010, her applications were denied on reconsideration. On March 18, 2010, Weatherly requested a hearing before an Administrative Law Judge ("ALJ"). On June 7, 2011, Weatherly appeared via video conference with a non-attorney representative before ALJ Julie K. Bruntz for an administrative hearing. In a decision dated August 16, 2011, the ALJ denied Weatherly's claims. The ALJ determined that Weatherly was not disabled and not entitled to SSI benefits because there are jobs that exist in significant numbers involving "light work" that Weatherly could perform, including usher, tanning salon attendant, and photo copier/machine operator. Weatherly appealed the ALJ's decision. On November 11, 2011, the Appeals Council denied Weatherly's request for review. Consequently, the ALJ's August 16, 2011 decision was adopted as the Commissioner's final decision.

On January 12, 2012, Weatherly filed this action for judicial review. The Commissioner filed an answer on March 22, 2012. On April 23, 2012, Weatherly filed a brief arguing that the ALJ did not pose a proper hypothetical question to the vocational expert, improperly disregarded medical evidence, and improperly discredited Weatherly's subjective complaints regarding her impairments. On July 6, 2012, the Commissioner

2

filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. Weatherly filed a reply brief on July 19, 2012, arguing that Weatherly's impairments, in their totality, warrant a finding that she is disabled. On January 30, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000))).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence that supports the ALJ's decision, but also the evidence that

3

detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion." (quoting *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005))).

## IV.  FACTS

### A.  *Weatherly's Education and Employment Background*

Weatherly was born in 1962.  At the administrative hearing, Weatherly testified that she completed school up to the tenth grade and later obtained her GED.  Weatherly has no other educational history or degrees.

The record contains a detailed earnings report, covering the years 1985 through 2011.  Weatherly had $441.29 of income in 1985, and no income in 1986 and 1987.  From 1988 to 1991, Weatherly earned between $116.55 (1988) and $3,954.60 (1990) annually. Weatherly had no income in 1992 or 1993.  From 1994 to 2009, Weatherly earned between $33.66 (2002) and $6,504.10 (2004) annually, with no reported income in 1997 and 2001.  Weatherly had no income in 2010 and 2011.

### B.  *Administrative Hearing Testimony*

### 1.    *Weatherly's Testimony*

Weatherly's representative asked her about several health problems she experienced. She began by discussing her experience with migraines:

> Q:   And how long have you had migraine headaches?
>
> A:   It's been a few years.  I can't say exactly when they started but . . . it's been a while.
>
> Q:   -- are you on medication for migraines?
>
> A:   Yes . . . I've tried several different ones. . . .
>
> Q:   How often do you experience a migraine?
>
> A:   Pretty much daily.  It would all, it all depends, you know.
>
> Q:   Okay.  And what are these migraines like?
>
> A:   They are pretty bad.  I have to lay down.
>
> Q:   For how long?
>
> A:   Oh, probably for about a couple of hours or so.
>       . . .
>
> Q:   Does anything set the migraines off? Do you do anything in particular?
>
> A:   No.
>
> Q:   Now when you have these migraines do you take medications?

A:    Yes. . . . right now I take Topamax and I've
        been on that for I'd say probably about seven,
        eight months.

Q:    And when you have the headache does the
        Topamax help?

A:    Well, I, I thought it did at first but then I, and
        then it seemed like they was getting probably
        kind of worse.  So she took me off of that and
        gave me some other migraine, I forgot the name.

Administrative Record at 43-44.

Weatherly then discussed her degenerative disc disease:

Q:    Now, and you also state that you have
        degenerative disc disease, is that correct?

A:    Yes.

Q:    Okay.  And where, do you have pain with that?

A:    That's pretty much all over my body but it's
        mostly in my, my knees, my back, and my arms.

Q:    And what kind of pain do your have in your
        knees?

A:    Oh, my, God, I mean I can't just describe it but
        they are, I don't know, they're terrible, I just
        can't describe it.

Q:    Okay.  And do you have any pain when you
        walk? . . .

A:    Some, I mean sometimes when I, when,
        sometimes when I walk and stuff I mean the pain
        is like, I don't know, like I have a broken bone
        or, or something.  I mean it's --

Q:    And is that in your knees or in your back?

A:    In my knees. . . .

Q:    And how far can you walk before you have to sit
        down?

A:    Probably about a couple of blocks.

Q:    And have you ever used a brace for your, for
        your pain in your knees?

A:    Yes.

Q:    When's the last time you used a brace?

A:    I would say I think it was probably like about a
        week ago.

Administrative Record at 44-45. Weatherly continued, stating that she did not use the brace every day and that the brace did not ease her pain, and while in the brace she would have to sit propped up and not bend her knees to avoid incurring pain. She further testified that she could only sit for an hour or so without experiencing pain in her knees and lower back.

Weatherly next described pain she had in her arms and shoulders due to arthritis:

> Q:   And what kind of pain do you have in your shoulders?
> A:   They're sharp pains. I went to the doctor and she did x-rays from pretty much my head to my toes and it's, I don't, it's arthritis but I done forgot what she, what kind of arthritis she said.

Administrative Record at 47. She went on to describe the numerous pain medications she takes, which make her drowsy and dizzy. Weatherly testified she recently began using pain patches, which help the pain a little, but they do not alleviate her pain altogether. She stated that she had numbness in her hands and that she drops things because her hands shake, but that she could engage in pushing, pulling, and reaching over her head. She also has difficulty squatting and getting out of the tub. She takes nortriptyline to ease her pain and help her sleep at night. She had received a Depo Medrol shot in the past, but noticed no difference in the amount of pain.

Weatherly then described in greater detail the pain and numbness she experiences and how it limits her functionality:

> Q:   Are you able to climb up and down stairs?
> A:   No. . . . Because of the severity of my, my knees.
> Q:   Do you have to use a rail when you walk up and down the stairs?
> A:   Yes, and sometimes crutches. . . .
> Q:   And what do you use the crutches for?
> A:   To go up, down the stairs, at least for balance sometimes.
> Q:   You have problems with balance?
> A:   Yes.

Q:    Have you ever fallen?

A:    Several times going up the stairs and down the
      stairs.

Q:    Okay.  And you can drive?

A:    Yes.

Q:    Do you have any problems driving?

A:    With my, well, my legs do go numb sometime,
      it all depends on how long I drive. . . . [I]t hurts
      me sometimes to . . . get out of the car.

Administrative Record at 49-50.  Weatherly testified that she spends her days performing small chores around the house at her own pace, including doing dishes, sweeping, and cooking, but needs to stop periodically and rest for 30-45 minutes due to pain.  She testified that she can take care of her own personal hygiene.  She also testified that she used to drink heavily and was previously incarcerated for cocaine use, but no longer abuses drugs or alcohol.  Weatherly stated she was taking medication for depression.

When the ALJ asked whether Weatherly had lost weight or tried to quit smoking as her doctor advised, she indicated that she had lost eight pounds and recently began using a nicotine patch to help her quit smoking.

### 2.   *Vocational Expert's Testimony*

At the hearing, the ALJ posed a hypothetical question to the vocational expert:

Q:    . . . [A]ssume that I have an individual who
      could occasionally lift and carry 20 pounds and
      could frequently lift and carry 10 pounds.  This
      individual could stand or walk for six hours in
      an eight hour workday and sit for six hours in an
      eight hour workday.  Her ability to push and
      pull, including the operation of hand and foot
      controls, would be unlimited.   She could
      occasionally climb ramps and stairs but she
      could not climb ladders, ropes, and scaffolding.
      She could occasionally balance, stoop, knee
      [sic], crouch, and crawl.   And she could
      occasionally reach overhead with the right arm.
      Given these limitations could the individual
      return to any past work?

8

Administrative Record at 59-60. The vocational expert indicated that such a person could not return to any past work similar to the past jobs Weatherly had – fast food worker, cashier, cleaner/housekeeper, or meat separator. The ALJ continued:

> Q:   If I have a younger individual with the past
>       relevant work as you described it, this residual
>       functional capacity, and a GED would there be
>       other jobs she could perform?

Administrative Record at 60. The vocational expert indicated that several light, unskilled jobs would be available to such an individual, including: approximately 200 jobs in Iowa as an usher, 100 jobs in Iowa as a tanning salon attendant, and 800 jobs in Iowa as a photocopy machine operator.

The ALJ asked a followup question regarding Weatherly's reaching ability: "Am I correct in assuming that [if] the limitation of reaching right arm overhead was eliminated that the claimant would be able to return to her past relevant work?" Administrative Record at 61. The vocational expert testified that, in those circumstances, such an individual would be able to return to Weatherly's past work, except for her job as a meat separator. The ALJ then further asked if there would be jobs for such an individual, without the reaching limitation, if that individual was limited to two hours of walking or standing in an eight-hour workday. The vocational expert testified that some sedentary jobs for such an individual would be available, including: approximately 200 jobs in Iowa as an addresser, 1,300 jobs in Iowa as a document preparer, and 700 jobs in Iowa as a telephone quotation clerk. After further questioning by the ALJ, the vocational expert confirmed there would be no competitive work for such an individual if she worked at a slow pace for one-third of the day or missed three or more days of work per month.

### C. Weatherly's Medical History

Weatherly received SSI benefits from 1997 through 2002, when they were discontinued due to her incarceration for drug use.

On March 6, 2009 Weatherly visited the Peoples Community Health Clinic ("Clinic") for a refill on a prescription of Lisinopril. She returned four days later and was evaluated by Dr. Sharon Duclos. Dr. Duclos made note of Weatherly's stressful living situation with her daughter, having returned to Iowa from Mississippi where she was living with a drug user. Dr. Duclos diagnosed Weatherly with hypertension and chest pain. In addition to the Lisinopril, she prescribed Weatherly 10 mg. a day of Norvac and 100 mg. a day of Zoloft for depression. X-rays of Weatherly taken that day revealed degenerative changes in her thoracic spine. Dr. Lawrence Liebscher's impression was that Weatherly had degenerative disease in her thoracic spine with no acute abnormality.

On May 12, 2009 Weatherly returned to Dr. Duclos for a follow-up appointment. Dr. Duclos noted that Weatherly had slightly decreased range-of-motion in her right hip with more pain during external rotation than internal rotation, but that she had full range-of-motion in her in her left hip and left knee. Dr. Duclos further observed that Weatherly had "good flexion, decreased extension, [and] okay side-to-side motion." Administrative Record at 240. Dr. Duclos diagnosed Weatherly with right hip pain, low back pain, left hip pain, palpitations, migraine headaches, and hypertension. She prescribed Weatherly metoprolol for her migraines, Relpax, and Celebrex. X-rays taken that day revealed "severe degenerative changes, L5-S1, with bilateral spondylolysis . . . and grade 1-2 spondylolisthesis" and "small irregular focus of increased density centrally in the distal femur having appearance suggesting small bone infarct or possibly enchondroma." Administrative Record at 253-55.

Weatherly saw Dr. Duclos again on July 15, 2009, when Dr. Duclos observed that Weatherly had full range-of-motion in her right elbow. An x-ray revealed no evidence of fracture, dislocation, joint effusion, or lesions in Weatherly's right elbow. Dr. Duclos also noted Weatherly's recurrent diarrhea and increased urinary frequency. She diagnosed Weatherly with right elbow pain, depression, hypertension, and migraines. Dr. Duclos added Phenergan and Topamax to Weatherly's migraine treatment. Each of Dr. Duclos's evaluations indicate that Weatherly was generally not in any acute distress. A chest x-ray

taken on August 5, 2009 revealed no abnormalities.  In September, Dr. Duclos prescribed Flagyl for Weatherly.

In a follow-up appointment on October, Dr. Duclos ordered an x-ray of Weatherly's right shoulder, which revealed "moderate to severe arthritis at the glenohumeral joint" and "mild arthritis at the AC joint."  Administrative record at 360.  Weatherly was given an 80 mg injection of Depo Medrol in her shoulder.  On November 2, 2009, Weatherly saw Dr. Jose Morcuende at the University of Iowa Hospitals and Clinics.  An X-ray of her legs revealed degenerative changes in the right knee, but was otherwise normal. Dr. Morcuende described his observations:

> [Weatherly] does have some mild peripatellar symptoms and some symptoms of mild synovitis along her patella with tracking.  She has some crepitus.  Otherwise, she has no coronal sagittal plane instability.  She has full range of motion and full strength and neurovascular function.  She has no tenderness to palpation along the femur or tibia.

Administrative Record at 305.  In his assessment, Dr. Morcuende indicated that:

> [The] imaging findings [were] consistent with a bone island. [Weatherly's] bone scan was unremarkable and at this point she does not appear to have any active neoplasm.  She does have some anterior knee pain consistent with possible underlying chondromalacia. . . . At this point, we do not think she has a pathologic lesion.

Administrative Record at 306.  Dr. Morcuende recommended anti-inflammatories for Weatherly's knee pain.

On November 3, 2009, Dr. Nagarantha Nadipuram evaluated Weatherly at the request of the Disability Determination Services Bureau.  Dr. Nadipuram noted Weatherly's difficulty elevating her right arm, limited flexion and extension in her hips, and commented on the range of her physical ability:

> [Weatherly] is able to lift about 15-20 lbs. for a couple of minutes and stand for about an hour, then she has to sit and change her positions.  Her legs go numb and then she cannot sit for longer than 20 minutes.  Her lower extremities go

numb. She cannot climb, stoop, kneel or crawl. She also has problems handling the object sometimes she drops them as she is holding. She has bilateral eye problems and has not seen an eye doctor since three months. She also has problems to hear in the left ear. She is unable to work in the high temperatures and unable to manager her own money and in my opinion, she does have severe degenerative disc disease, osteoarthritis, severe obesity, bilateral knee pain left worse than right.

Administrative Record at 315. Dr. Nadipuram suggested that Weatherly lose weight, but indicated that she lacked the motivation to do so.

In an RFC assessment dated November 25, 2011, Dr. Donald Schumate evaluated Weatherly's exertional limitations, indicating that Weatherly could occasionally lift or carry a maximum of 20 pounds, could frequently lift or carry 10 pounds, could walk, stand, or sit for about 6 hours in an 8-hour work day. With respect to Weatherly's postural limitations, Dr. Schumate found that Weatherly could "occasionally" engage in "climbing - ramps/stairs, Balancing, Stooping, Kneeling, Crouching," and "Crawling." Administrative Record a 319. Dr. Schumate indicated that Weatherly should avoid concentrated exposure to hazards, but did not find any other environmental limitations, including extreme cold and extreme heat exposure, contrary to Dr. Nadipuram's conclusions. Administrative Record at 319-21. Dr. Schumate found no manipulative, visual, or communicative limitations. Dr. Schumate noted that the "ESS essentially repeats the claimants [sic] self reported functional limitations which are internally inconsistent with the minimal objective findings." Administrative Record at 323.

Weatherly entered the emergency room on November 29, 2009, complaining of a slight headache and right shoulder pain after a false ceiling fell on her head. Dr. Hameed Khan diagnosed Weatherly with a headache and soft tissue injury to her right shoulder, gave her a 60 mg injection of ER-Ketorolac, and discharged her to her home. An x-ray of her right shoulder revealed "moderate degenerative change within the AC joint and moderate degenerative change within the glenohumeral joint." Administrative Record at 330.

In an RFC assessment dated February 22, 2010, Dr. Jan Hunter found the same exertional, postural, visual, and communicative limitations as Dr. Schumate in the RFC described above. Dr. Hunter further found no environmental limitations, but found with respect to Weatherly's manipulative limitations that her ability to reach in all directions was limited.

On March 1, 2010, Weatherly saw Dr. Duclos and complained of bilateral knee pain, chest pain, and feeling overwhelmed. Dr. Duclos continued Weatherly on her medications and referred her for counseling. On April 13, 2010, Weatherly saw Gene Kinnaly, a physician's assistant at the Clinic, who diagnosed her with degenerative joint disease in her left knee. Kinnaly prescribed her 100 mg of Darvocet for the pain. In a follow-up appointment on May 4, 2010, Dr. Duclos diagnosed Weatherly with migraine headaches and low back pain with recurring numbness in her legs, and increased the Topomax to 100 mg twice a day. On May 13, 2010, Weatherly returned to the Clinic again, complaining of audible wheezing, for which she was prescribed a sample inhaler. Weatherly also complained of chronic back, knee, and right shoulder plain.

Weatherly entered the emergency room on June 1, 2010 for viral pharyngitis (sore throat) and was discharged to her home. Weatherly returned to the emergency room on June 17, 2010, complaining of right knee pain after twisting her knee at home. An X-ray of her knee revealed no acute fracture or dislocation, though tricompartmental osteoarthritic changes were noted. Dr. Todd Lawrence diagnosed Weatherly with soft tissue injury and degenerative arthritis of the right knee, prescribed ibuprofen and lortab, and discharged her to her home. On June 24, Weatherly saw Dr. Arnold Delbridge for her knee injury. Dr. Delbridge noted swelling and tenderness and diagnosed her with a right knee contusion and effusion and degenerative arthritis in her right knee.

Weatherly saw Dr. Duclos on July 7, 2010, and was diagnosed with osteoarthritis in her right knee and right shoulder. Dr. Duclos had Weatherly increase her Tramadol to three times daily. Weatherly again saw Dr. Delbridge, who advised her to keep her leg in an immobilizer which she received while at the hospital. Weatherly went to the Clinic

on July 27, 2010, complaining of swollen lips.  Dr. Muhammad Pathan switched her from lisinopril hydrochlorothiazide to 25 mg of Spiro hydrochlorothiazide daily, and noted that Weatherly complained of a burning feeling in her legs.  Weatherly saw Dr. Delbridge again on August 6, 2010, who recommended she stop using the immobilizer, as the injury had mostly healed.

Weatherly visited the Clinic on August 20, 2010 with GERD symptoms. Throughout Fall of 2010, Weatherly received treatment for incontinence and GERD symptoms.  On November 11, 2010, Weatherly visited the Clinic complaining of lower back pain and sore knees.  She was prescribed Meloxicam and told to continue taking tramadol as needed.  She returned to the Clinic on December 1, 2010 complaining of knee pain.  Dr. Duclos diagnosed her with hypertension, right knee pain, and multiple arthralgias.  Weatherly declined to receive another Depo Medrol shot.  An x-ray of Weatherly's knee taken that day revealed no evidence of fracture, dislocation, join effusion, or lesions, although small periarticular spurs were noted.  On December 20, 2010, Weatherly visited the hospital complaining of right hip pain with decreased range of motion, but no hip abnormalities were found.

On January 7, 2011, Weatherly visited the Clinic complaining of bilateral shoulder pain.  In a follow-up appointment on February 1, 2011, Dr. Duclos diagnosed Weatherly with multiple arthralgias with possible Lupus, and prescribed her with prednisone and Furosemide.  On March 18, 2011, Dr. Rebecca Tuetken evaluated Weatherly at the hospital.  Dr. Tuetken indicated that Weatherly's symptoms were likely not due to rheumatoid arthritis, but that she likely did suffer from obstructive sleep apnea.  Weatherly saw Dr. Duclos on March 23, 2011, and was diagnosed with lower extremity swelling, shortness of breath, hypertension, snoring, and obesity.  An x-ray taken on April 15 , 2011 of Weatherly's back revealed lumbar spondylosis with spondylolisthesis and disk space loss at L5-S1.  Weatherly returned to the Clinic on April 20, 2011, and was scheduled for an MRI of her lower back.  On May 13, 2011, doctors Christopher Luty and Jack Kademian evaluated Weatherly at the hospital following the MRI.  They opined that Weatherly

suffered from "[m]ultilevel degenerative disease . . . with grade 2 anterolisthesis of L5 on S1 with severe neural foraminal stenosis." Administrative Record at 489.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Weatherly is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "It is 'the ALJ's

responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Weatherly had not engaged in substantial gainful activity since July 27, 2009. At the second step, the ALJ concluded from the medical evidence that Weatherly had the following severe impairments: degenerative joint disease of the lumbar spine, status post remote surgery; obesity; degenerative joint disease of the right shoulder; and degenerative joint disease of the right knee. At the third step, the ALJ found that Weatherly did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Weatherly's RFC as follows:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform light work . . . involving lifting and carrying twenty pounds occasionally and ten pounds frequently; ability to push and pull, including operation of hand and foot controls, would be unlimited within the lifting restrictions; stand/walk six hours in an eight hour day; sit six hours in an eight hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and could occasionally reach overhead with the right arm.

Administrative Record at 20. At the fifth step, the ALJ determined that, while Weatherly could not perform her past relevant work, there are jobs that exist in significant numbers in the national economy that she could perform, including: usher, tanning salon attendant, and photo copier or machine operator. Therefore, the ALJ concluded that Weatherly was not disabled.

### B. Objections Raised By Claimant

Weatherly argues that the ALJ's determination that she is not disabled is not supported by substantial evidence in the record as a whole. Weatherly contends that the ALJ improperly discredited both medical evidence in the record and her subjective

complaints concerning her impairments.  In doing so, Weatherly asserts that the ALJ's RFC was flawed because it was based on a hypothetical question to the vocational expert that failed to properly consider her potential chronic absenteeism, the limitations on her ability to sit or stand for extended periods, and her postural limitations.

### 1.   *Evaluation of Medical Evidence and the ALJ's Hypothetical Question to the Vocational Expert*

Weatherly argues that the ALJ improperly discredited medical evidence that corroborates her alleged functional limitations, and that as a result the RFC is flawed because the hypothetical question to the vocational expert was inadequate.  Specifically, Weatherly focuses on Dr. Nadipuram's and her treating physicians' evaluation of her functional limitations.

When reviewing a denial of social security benefits, the court must affirm the denial where the ALJ's finding of no disability "is supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).  However, as the court in *Lauer v. Apfel* recognized, "the absence of an opinion does not constitute substantial evidence supporting the ALJ's findings."  245 F.3d 700, 705 (8th Cir. 2001).  The ALJ must base her decision on "some medical evidence" rather than a lack of conflicting or inconsistent medical evidence. *Id.* at 704 (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).  In her ruling, the ALJ specifically cites Weatherly's lack of "emergent care, hospitalization, physical therapy, or pain clinic management" and "restrictions recommended by [Weatherly's] treating doctor" as support for her disabiltiy determination.  Administrative Record at 24.  However, merely stating that medical evidence is consistent with a finding of no disability without any affirmative medical evidence to support that finding does not constitute substantial evidence. *See id.* (finding that the absence of an opinion about a medical issue that an examining physician was never asked to opine about does not constitute substantial evidence that that medical issue is not disabling).

Further, the ALJ merely recited Dr. Nadipuram's observations without making any explicit assessment of its weight or credibility.  In making a disability determination, "[a]n

ALJ must not substitute his opinions for those of the physician." *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) (quoting *Ness v. Sullivan*, 904 F.3d 432, 435 (8th Cir. 1990)). However, an ALJ "may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole." *Id.* (quoting *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002)). For the ALJ to reject Dr. Nadipuram's opinion, it must be inconsistent with the medical record as a whole. However, the ALJ's conclusion is not supported by substantial evidence in the record because her opinion focuses almost exclusively on the lack of medical evidence supporting Weatherly's subjective allegations rather than identifying affirmative medical evidence that is inconsistent those allegations. *See Apfel*, 245 F.3d at 705 ; *see also Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment."). The Commissioner alleges that Dr. Nadipuram's suggestion that Weatherly lose weight is inconsistent with Weatherly's contention that her knee pain is disabling. However, a suggestion to "lose weight" does not necessarily imply physical exercise, as opposed to dieting and eating healthy, and Dr. Nadipuram's use of the word "exercise" at the end of her opinion is vague. If the ALJ found that Dr. Nadipuram's observations lacked merit or credibility because it was inconsistent with the other evidence, she did not explain why in her ruling.

In considering the ALJ's decision, the Court finds that the RFC is not supported by substantial evidence from the record as a whole. Dr. Nadipuram's evaluation corroborates many of the symptoms that Weatherly allegedly experiences, including postural limitations and her inability to sit or stand for extended periods. Further, none of the medical evidence the ALJ discusses in her decision conflicts or is inconsistent with Dr. Nadipuram's findings; rather, reports from her treating physician, Dr. Duclos, are largely silent with respect to Weatherly's functional limitations. If anything, Weatherly's

recurring doctor's visits for knee pain, migraines, and back pain further legitimize Dr. Nadipuram's findings.

Because the RFC that the ALJ's hypothetical question to the vocational expert was based on was not supported by substantial evidence in the record as a whole, "there is no way to determine whether the [hypothetical] question posed accurately reflected [the claimant's] abilities and limitations." *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998). Therefore, the vocational expert's testimony in response to the ALJ's hypothetical question does not constitute substantial evidence that there are jobs available in the national economy that Weatherly can perform. Accordingly, the Court determines that remand is appropriate. On remand the ALJ must fully and fairly develop the record with regard to Dr. Nadipuram's evaluation, especially as it relates to the ALJ's RFC assessment. If necessary, the ALJ must also provide the vocational expert with a hypothetical question that takes into consideration all of the "concrete consequences" of Weatherly's limitations based on the medical evidence as a whole, including the opinions of Dr. Nadipuram. *See Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001).

### 2. *The ALJ's Assessment of Weatherly's Credibility*

Weatherly also argues that the ALJ improperly discredited Weatherly's own subjective allegations concerning her physical impairments. Specifically, Weatherly asserts that the ALJ's reason for discrediting her testimony was improper because the ALJ's decision rested in her determination that Weatherly's complaints were not supported by the objective medical evidence in the record.

The purpose of the RFC is to assess what a claimant can accomplish in light of her condition as a whole to the extent it does not interfere with her ability to work. *See* 20 C.F.R. § 416.945(a)(1). Part of this evaluation includes a consideration of the claimant's subjective symptoms or complaints about her condition. *Id.* at § 416.945(e). In assessing these subjective complaints, the ALJ must consider, in addition to medical evidence:

(I)    [The claimant's] daily activities

(ii)   The location, duration, frequency, and intensity of [the claimant's] your pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;

(v)    Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;

(vi)   Any measure [the claimant] use[s] or ha[s] used to relieve [the claimant's] pain or other symptoms . . . ; and

(vii)  Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms

*Id.* at § 416.929(c)(3)(i-vii); *see also Polaski v. Heckler*, 739 F.2d 1320, 1320 (8th Cir. 1984) (discussing these requirements).

The regulations clearly require that the ALJ, in reviewing a denial of benefits, consider all available evidence in "evaluat[ing] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [her] capacity to work." *Id.* at § 416.929(c)(1). The ALJ must then "evaluate [the claimant's] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant] is disabled." *Id.* at § 416.929(c)(4). In addition to the claimant's own subjective complaints, an ALJ may also properly consider the absence of objective medical evidence to support those complaints. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th

Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors.").

While the ALJ mentioned the *Polaski* factors in her decision, she did not adequately discuss the factors as they apply to Weatherly. Instead, the ALJ primarily recited descriptions of Weatherly's conditions from the available medical records without explicitly describing the inconsistencies between the medical evidence and the *Polaski* factors as applied to Weatherly. An ALJ is "not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). In reaching her RFC, the ALJ made the following assessment of the *Polaski* factors with respect to Weatherly's allegations:

> At one point or another in the record, either in forms completed in connection with the application, in medical records or other statements, the claimant reported activities of daily living including independent personal care, meal preparation, household chores, laundry, shopping, driving, watching television, reading, and visiting with family members. Medical records reflect reports of working two days a week in a kitchen involving heavy lifting in October 2009 and trying to go to school in March 2010. (Exhibits 7F and 11F). She was also running errands for her daughter.

Administrative Record at 23-24. The ALJ then concludes that "[t]hese activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" – apparently, relying her own judgment in the absence of specific findings that performing those activities is inconsistent with Weatherly's allegations.

While the ALJ has pointed to these specific instances to suggest Weatherly's compaints are not credible, the ALJ has failed to indicate what about these facts are inconsistent with Weatherly's testimony. With respect to Weatherly's daily activities, the Eighth Circuit has held that a claimant's mere ability to do housework is not necessarily inconsistent with complaints of pain nor his inability to hold full-time work. *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008). Weatherly's testimony that she could clean and take care of herself was accompanied by testimony that she needed to rest periodically for 30-45 minutes. While the record does not include evidence from examining physicians that specifically details these allegations, they are not inconsistent with the record as a whole. A medical evaluation from the Clinic Weatherly was visiting does indicate that she performed "heavy lifting" while working at a kitchen, but there is no evidence to suggest this "heavy lifting" was in excess of 15-20 pounds or otherwise contradicts or is inconsistent with Dr. Nadipuram's evaluation of Weatherly, nor is there evidence of how often Weatherly performed such lifting or about the other work she did at the kitchen.

In sum, the ALJ's discussion and application of the *Polaski* factors to Weatherly subjective allegations were inadequate. Even though some of Weatherly's assertions may not be directly supported by the medical evidence, the ALJ did not adequately discuss the reasons they were inconsistent with the record as a whole before finding they were not credible. Accordingly, the Court finds that this matter should be remanded for further development of the record with regard to Weatherly's credibility. On remand, the ALJ must set forth in detail her reasons for finding Weatherly's subjective allegations to be credible or not credible. If, on remand, the ALJ finds Weatherly's testimony not to be credible, the ALJ must fully explain the reasons for her credibility determination and fully

explain the inconsistencies between Weatherly's subjective allegations and the evidence in the record.

## C.  Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g).  The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled).  In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127.  Instead, the ALJ simply failed to:  (1) fully and fairly develop the record with regard to the opinions of Dr. Nadipuram; (2) provide the vocational expert with a hypothetical question that captured the concrete consequences of Weatherly's limitations based on the medical evidence as a whole; and (3) make a proper credibility determination in this matter.  Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court finds that the ALJ's determination that Weatherly is not disabled is not supported by substantial evidence in the record when considered in whole.  The ALJ did not properly consider Dr. Nadipuram's evaluation of Weatherly in reaching her RFC, or, in the alternative, did not adequately explain why she discredited the evaluation. Further, the ALJ did not fully consider the *Polaski* factors in assessing Weatherly's subjective comlpaints.  Accordingly, the Court remands this case to the ALJ to fully consider Dr. Nadipuram's medical opinion and adequately address the *Polaski* factors when determining the credibility of Weatherly's subjective allegations.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

The matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _15ᵗʰ_ day of November, 2012.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA